MARTHA ECCLES, APPELLANT, V. DURLAND TRUST COMPANY, APPELLEE.

FILED DECEMBER 7, 1934. No. 29025.

*Deutsch & Young,* for appellant.

*M. S. McDuffee* and *Mapes & Mapes, contra.*

Heard before GOSS, C. J., ROSE, EBERLY, DAY and PAINE, JJ., and RAPER, District Judge.

GOSS, C. J.

Plaintiff appeals from an adverse judgment in her suit for an accounting, for rescission of the purchase of a real estate mortgage and for judgment for the amount she invested therein with interest from the date of purchase.

Plaintiff lived at Norfolk. She was widowed in 1912, and soon thereafter began investing her money through

defendant, a trust company of the same place engaged in making farm loans. Her investments went well, so far as the record shows, until the one here made on January 25, 1922, when she purchased from defendant a $2,000 mortgage made by Emil K. Belgum and wife on the east half of a section of land in Kimball county. The mortgage was dated October 10, 1921, and was one of three mortgages made by the Belgums to defendant on their farm of which the land involved here was a part. The mortgage was a first mortgage on the land. There were no buildings on it. After plaintiff had received three payments of interest the makers defaulted. February 26, 1926, Durland Trust Company brought a suit to foreclose all the mortgages in one action. Plaintiff authorized the suit to be brought in the name of the trust company. Her mortgage was set up in the third cause of action. A decree was entered May 4, 1926, allowing $2,658.75 on this mortgage. March 28, 1927, the land was sold at sheriff's sale, bid in by the trust company, and on April 13, 1927, was conveyed to it by the sheriff. Thereafter plaintiff, claiming to have discovered in the summer of 1930 that the loan was unsound and that at no time during its tenure was the land worth the amount thereof, brought this suit to rescind the purchase and for a judgment against the trust company for her money expended and interest thereon. She alleges that there was a fiduciary relationship of trust and confidence, that defendant breached its duty to her and she has elected to rescind the purchase and to demand her money back with interest.

Defendant's answer was to the effect that plaintiff purchased the mortgage relying upon her own judgment.

The chief cause of the trouble is that the land is not now worth the amount of the mortgage lien against it. If it were, there probably would be no controversy. There is a conflict of evidence as to what the land was worth on October 10, 1921, when the mortgage was made, or on January 25, 1922, when it was sold to plaintiff.

William L. Bates, real estate, Kimball, testified by dep-

osition on behalf of plaintiff that, in January, 1922, the land was not worth over $3.50 an acre and is not worth more now. He had inspected the land. M. Havens, who invests his own money in mortgage loans, testified for plaintiff on the trial. He had been in Kimball county, but had not seen the land. He testified that a half section of "pasture land" would be worthless. When asked why it would be worthless, he answered: "Simply because you can't dispose of it." Frank A. Smith, in the real estate business, testified by deposition for plaintiff that the half section of land was worth from $1,250 to $1,350 now and it might have been a little higher in January, 1922. Guy W. Forsling, in the real estate business, testified on behalf of plaintiff, by deposition, that in 1922 the half section was worth $800.

The following persons testified by deposition, on behalf of defendant, as to the value of the half section in 1922: Gus Rieseberg, farmer, $20 an acre; E. G. Meredith, farmer and county commissioner, the plow land $30 an acre, the grazing land $10 an acre; Frank A. Travis, farmer, $10 an acre.

Leonard L. Wilson, with seven years in the college of agriculture, county agent for Kimball county for nearly four years, made a thorough examination of the land and produced a map, made by him, which was introduced in evidence. He testified that there are 84 acres of plowed land and about 62 acres more that is tillable, making a total of 146 acres. It is mostly Sidney loam, the most prevalent soil in Kimball county. It is a soil that has considerable fertility and depth. The 84 acres are good potato land and would compare favorably with any potato land in the county. The land not tillable is pasture land. The tillable land would make fair wheat land, but is of the type that potatoes, corn and beans would grow on more readily than wheat.

Glen Hunt, a graduate of the college of agriculture, and formerly county agent of Kimball county, owning and operating about 1,500 acres of land, buying and shipping

potatoes, had examined the land, and his testimony as to the character of the land and quantity of tillable land was much like that of Leonard L. Wilson. He estimated, on cross-examination by plaintiff's counsel, that the land was worth $10 an acre.

Much has been said about the rough character of the land. We quote from the testimony of Leonard L. Wilson: "Through the west third of the half section there is a draw that runs generally north and south, draining from the south to the north; along the edges of this draw there are considerable areas of grass land mounting up to the higher table land on either side; at the break of the table land there are some outcroppings of lime rock, and as you mount up on the table land you find areas of flat land, some of which are plowed, some that are tillable; this I have designated on the map."

Mrs. Eccles testified that she took her money out of a bank and turned it over to the trust company. That Mr. Nicola, the president of the trust company, told her this mortgage was "a very good investment, in fact the best he had." The evidence shows she withdrew the money from her bank and took it to the trust company on January 20, 1922, and did not get her papers until January 25, 1922, because the mortgage had been put up as collateral elsewhere and had to be sent for. Mr. Nicola testified, and was corroborated by Mr. Lederer, that he went to California January 14, 1922, and did not return until late in the spring. Mr. Lederer, the treasurer of the company, testified that plaintiff's dealings were with him. He testified that Mrs. Eccles selected the Belgum loan from a list of loans on hand. He showed her the list. It contained some $2,000 loans and some loans of larger amounts in bonds of $1,000 each. The company had $100,000 capital and had a surplus. Practically all was then invested in loans. He told Mrs. Eccles the company considered it a good loan. In rebuttal Mrs. Eccles answered in the negative to the following question: "Never talked with them about investing or recommending to you how your funds should be

invested?" But she testified that Mr. Nicola called her up in December, she gave the bank thirty days' notice, and, when she got the money, took it to the trust company on January 20, and insists that the transaction was with Mr. Nicola, who had all the papers ready. She says she just left the selection to him.

Assuming that Mr. Nicola, or Mr. Lederer, as the case may be, told her the loan was considered by the trust company a good loan, or words to that effect, we think the case made out falls short of being actionable. No "fiduciary relation" between the trust company and plaintiff has been shown to exist in the sense that plaintiff would have us declare and apply that term. Plaintiff had her money in a bank drawing 5 per cent. She went to the bank in August, 1921, to withdraw it because she wanted a better return. The bank persuaded her to leave it at 6 per cent. She left it until December, when she "heard the bank was shaky," gave notice and on January 20, 1922, bought the present mortgage. The loan was considered good as loans with so high a rate of interest went, and that was what she wanted. The company had loaned money in Kimball county for years. Interest was paid promptly for some time. That county had a real estate setback in 1922 and was just recovering when the depression of 1929 arrived.

As to the testimony taken by deposition, the trial court and this court had equal opportunity. As to the other testimony, the trial court observed the witnesses, which we cannot do. The burden was upon plaintiff to make out a case. Taking into consideration all the evidence upon this trial *de novo* and the finding of the trial court against her, we are of the opinion that the judgment of the trial court should be affirmed.

AFFIRMED.